112 T.C. No. 10


UNITED STATES TAX COURT


INTERLAKE CORPORATION, SUCCESSOR IN INTEREST TO INTERLAKE, INC.,
AND CONSOLIDATED SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8258-96.                    Filed March 18, 1999.


        P, as the result of a restructuring transaction,
became the successor common parent of a consolidated
group of corporations (the group).  A, the former
common parent of the group, became a wholly owned
subsidiary of P.  P then distributed, pro rata, to its
shareholders, all of the issued and outstanding common
shares of A, which became, as a result of the spinoff,
a separate publicly traded corporation.
        Subsequent to the restructuring transaction, P and
the group incurred a consolidated net operating loss
(CNOL).  P filed an application under sec. 6411,
I.R.C., for a tentative refund of income tax
attributable to the carryback of the postrestructuring
transaction CNOL to 1984, a prespinoff year during
which A controlled the group.  A and its new group also
incurred a postrestructuring transaction CNOL for which
A filed an application under sec. 6411, I.R.C., for a
tentative refund of income tax attributable to the
carryback of its postrestructuring transaction CNOL to

1981 and 1984, prespinoff years during which A controlled the group. After review by the Internal Revenue Service, the requested tentative refunds were issued to P and A, respectively. The tentative refunds issued to A were treated as rebate refunds with respect to P and the group for purposes of computing the group's deficiencies for 1981 and 1984.

P contends that the tentative refunds in issue were paid to the wrong taxpayer, and therefore the tentative refunds do not constitute rebate refunds. R concedes that a refund issued to the wrong taxpayer, or to an unauthorized representative of the taxpayer is a nonrebate refund that may not be taken into account in determining the taxpayer's deficiency. However, R contends that payment to A was proper because A was an authorized representative of the group for purposes of the issuance of the tentative refunds.

Held: The tentative refunds constitute nonrebate refunds with respect to P and the group because A's authority to act for the group, at least with respect to the issuance and receipt of the tentative refunds, terminated when A's affiliation with the group terminated. Accordingly, A was not an authorized recipient of the tentative refunds, and respondent cannot seek recovery of the tentative refunds from P through the deficiency procedures. Union Oil Co. v. Commissioner, 101 T.C. 130 (1993), distinguished.

John M. Newman, Jr., and Kenneth E. Updegraft, Jr., for petitioner.

Lawrence C. Letkewicz, for respondent.

OPINION

WELLS, Judge: This matter is before the Court on the parties' cross-motions for summary judgment pursuant to Rule 121(a). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in

issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Respondent determined deficiencies in the Federal income tax of the Interlake Corp. and its consolidated subsidiaries as follows:

| Year | Deficiency |
|------|-----------|
| 1974 | $78 |
| 1975 | 21 |
| 1976 | 19,750 |
| 1977 | 66 |
| 1978 | 19 |
| 1980 | 952,588 |
| 1981 | 1,751,739 |
| 1983 | 4,413,390 |
| 1984 | 9,796,362 |

After concessions by petitioner, only the deficiencies with respect to 1981 and 1984 remain in issue. We must decide whether certain tentative refund allowances that were paid to Acme Steel Co. (formerly Interlake, Inc.), with respect to taxable years 1981 and 1984 constitute rebates to petitioner, Interlake Corp. (successor in interest to Interlake, Inc.), and its consolidated subsidiaries, for purposes of computing petitioner's deficiency, if any, for taxable years 1981 and 1984.

Summary judgment may be granted if the pleadings and other materials demonstrate that no genuine issue exists as to any of the material facts and that a decision may be entered as a matter of law. See Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994). The parties agree, and the record shows, that there is no genuine

issue as to any material fact.  Accordingly, we may render judgment on the issue in this case as a matter of law.  See Rule 121(b).

## Background

Some of the facts and certain exhibits have been stipulated by the parties for purposes of the instant motion.  The stipulation of facts is incorporated in this Opinion by reference.  When petitioner filed its petition in the instant case, its principal place of business was located in Lisle, Illinois.

As a result of a May 29, 1986, restructuring transaction (restructuring transaction), petitioner became the successor common parent of a consolidated group of corporations that had previously been headed by Interlake, Inc.  References to the group are to the group of consolidated corporations controlled by Interlake, Inc., before the restructuring transaction and then by petitioner after the restructuring transaction.

## The Restructuring

Prior to the restructuring transaction, Interlake, Inc., was the common parent of the group.  The group consisted of various subsidiaries, including the Alabama Metalurgical Corp. (AMC).  Interlake, Inc., was a publicly owned corporation, and its shares of common stock were listed and traded on the New York Stock Exchange (NYSE).

Petitioner was organized on February 26, 1986, in anticipation of the planned restructuring transaction.  From its

incorporation until the restructuring transaction on May 29, 1986, petitioner was a wholly owned subsidiary of Interlake, Inc., and a member of the group.

As a result of the restructuring transaction, Interlake, Inc., became a wholly owned subsidiary of petitioner, and AMC became a wholly owned subsidiary of Interlake, Inc.[1]  Immediately following the restructuring transaction, Interlake, Inc., changed its name to Acme Steel Co. (Acme), which continued to use Interlake, Inc.'s Federal identification number after the restructuring transaction.

As a result of the restructuring transaction, petitioner became the successor common parent of the continuing group. Petitioner is a publicly owned corporation, and its shares of common stock are listed and traded on the NYSE.

The Spinoff

On June 23, 1986, petitioner distributed, pro rata to its shareholders, all of the issued and outstanding common shares of Acme (spinoff).  As a result of the spinoff, Acme became a separate publicly traded corporation, the shares of which are listed and traded on the National Association of Securities Dealers Automated Quotation system.

The June 23, 1986, spinoff severed Acme's tie to the group. Petitioner and Acme ceased to be members of the same consolidated group, and, since the spinoff, they are not under common control.

---

[1]     All of the outstanding common shares of Interlake, Inc., were converted into common shares of petitioner.

Additionally, neither petitioner nor Acme owns any shares of stock in the other or any of the other's affiliates.

The parties do not stipulate as to the tax character of the restructuring transaction or the spinoff.

The Tentative Refund Allowances

Petitioner

On their 1986 consolidated Federal income tax return, filed on or about August 7, 1987, petitioner and the group reported a consolidated net operating loss (CNOL) in the amount of $8,461,369 and excess consolidated general business credits in the amount of $1,496,693. The return was prepared on the basis that petitioner is the successor common parent of the group, and it included the taxable income or loss of petitioner and each member of the group for either (1) the entire 52-53 week year (beginning on December 30, 1985, and ending on December 28, 1986) or (2) the portion of that taxable year during which each such corporation was a member of the group.

On or about August 11, 1987, petitioner and the group filed, with the Internal Revenue Service Center, Kansas City, Missouri (service center), Form 1139, Corporation Application for Tentative Refund. On the application, petitioner and the group requested a tentative refund of income tax in the amount of $5,346,097 attributable to the carryback of the 1986 CNOL and excess consolidated business credits to the group's 1984 taxable year. Petitioner attached to the application for tentative refund allowance a statement detailing the restructuring

transaction in which petitioner became the successor common parent of the group.

On or about September 14, 1987, the service center, after processing petitioner's application, made a tentative refund allowance to petitioner in the amount of $5,346,097. The service center charged the tentative refund allowance to the Federal income tax account of the group for 1984 (i.e., to the tax account of Acme).

Acme

Acme and its wholly owned domestic subsidiary, AMC, had a short taxable year for 1986, which short taxable year began on June 23 and ended on December 28. On their consolidated Federal income tax return for the 27-week short taxable year ended on December 28, 1986, Acme, and its consolidated subsidiary, AMC, reported a CNOL in the amount of $29,286,968, the entire amount of which was attributable to Acme. The return was prepared on the basis that, after the spinoff, Acme and its consolidated subsidiary, AMC, constituted a new consolidated group, which was unrelated to petitioner and the group.

On or about September 17, 1987, Acme and its consolidated subsidiary filed, with the service center, two Forms 1139, Corporation Application for Tentative Refund. On the first Form 1139, Acme and its consolidated subsidiary requested a tentative refund of income tax in the amount of $11,298,371, attributable to the carryback of the Acme 1986 short-year CNOL to Acme's (i.e., the group's) 1984 and 1985 tax years. Included in the

application package was a copy of petitioner's Form 1120X, Amended U.S. Corporation Income Tax Return, for the taxable year 1984.[2] That Form 1120X indicates that petitioner is the "Successor in interest to Interlake, Inc. [i.e., Acme] and Consolidated Subsidiaries."

On the second Form 1139, Acme and its consolidated subsidiary requested a tentative refund of income tax in the amount of $148,692 attributable to the carryback of $174,931 of investment tax credits and certain credits for increasing research activity from Acme's (i.e., the group's) 1984 tax year to Acme's (i.e., the group's) 1981 tax year.[3]

After reviewing the two Forms 1139 filed by Acme and its consolidated subsidiary, the service center advised Acme that it could not process the first Form 1139 (relating to 1984 and 1985) as filed because it did not take into account the tentative refund allowance previously made to petitioner and the group with respect to Acme's (i.e., the group's) 1984 tax year. Acme then filed, on or about October 26, 1987, a revised Form 1139 for tax

---

[2] Petitioner filed the Form 1120X on or about Oct. 31, 1986, subsequent to the restructuring transaction and spinoff, to eliminate $2,120,691 of investment tax credit (ITC) carryovers from 1982 and 1983. As a result of an Internal Revenue Service audit, the group's tax liability for 1980 and 1981 was sufficiently increased to absorb the 1982 and 1983 ITC's as carrybacks.

[3] Acme also filed Form 8302, Application for Electronic Funds Transfer of Tax Refund of $1 Million or More, in which it requested that the tentative refunds for 1984 and 1985 be wired to an account maintained by Acme at the First Natl. Bank of Chicago.

years 1984 and 1985 which took into account the earlier tentative refund allowance paid to petitioner.  On the revised Form 1139, Acme and its consolidated subsidiary requested tentative refunds of income tax for 1984 and 1985 in the amounts of $3,109,026 and $3,524,388, respectively.

On or about November 1, 1987, the service center, after processing Acme's revised Form 1139 relating to 1984 and 1985 and the original Form 1139 relating to 1981, made tentative refund allowances (tentative refunds) to Acme as follows:

| Amount of Tentative Refund Allowance | Taxable Year Ended |
|---|---|
| $148,692 | 12/27/81 |
| 3,109,026 | 12/30/84 |
| 3,524,388 | 12/29/85 |

The service center charged the tentative refund allowances that it paid to Acme to the Federal income tax account of the group for 1984 (i.e., to the tax account of Acme).  Neither petitioner nor the group received, directly or indirectly, any portion of the tentative refunds paid to Acme.

Examination of Acme's 1986 Tax Return

A subsequent examination of Acme's 1986 short-year Federal income tax return resulted in a determination by the Internal Revenue Service (Service) that Acme and its consolidated subsidiary did not sustain a CNOL in the amount of $29,286,968, as claimed on their 1986 consolidated Federal income tax return. Instead, the Service determined that Acme and its consolidated subsidiary have a CNOL in the amount of $13,180,810 for the 1986

short-year, and that the entire CNOL is attributable to Acme in accordance with section 1.1502-79(a)(3), Income Tax Regs.[4] Several consequences arise from the Service's determination. The first consequence is that no portion of the $13,180,810 CNOL sustained by Acme for its 1986 short taxable year is allowable as a carryback to Acme's (i.e., the group's) 1985 taxable year. Secondly, the entire $13,180,810 CNOL is allowable as a carryback to Acme's (i.e., the group's) 1984 taxable year. The final consequence is that there are no excess investment tax credits and/or credits for increasing research activity arising during Acme's (i.e., the group's) 1984 taxable year that can be carried back to Acme's (i.e., the group's) 1981 taxable year.

Computation of Petitioner's Deficiency for 1981 and 1984

Respondent treated the tentative refunds paid to Acme as rebates to petitioner and the group in the computation of the group's deficiencies for 1981 and 1984.

The parties stipulated that if the tentative refunds constitute "rebates" to petitioner and the group, then, without taking into account certain unapplied payments made by petitioner,[5] petitioner and the group are liable for deficiencies for 1981 and 1984 in the amounts of $1,709,109 and $2,090,177,

[4] Acme has agreed to extend the statutory period for assessment applicable to it and its consolidated subsidiary's 27-week short taxable year ended Dec. 28, 1986.

[5] Unapplied payments were made by petitioner on Aug. 31, 1992, in the amounts of $616,285.76, $2,509.14, and $3,925,935.52 for taxable years 1980, 1982, and 1983, respectively.

respectively.  If, however, the tentative refunds do not constitute "rebates" to petitioner and the group, then (1) petitioner and the group are liable for a deficiency in the amount of $1,560,417 for 1981, and (2) there is no deficiency in the income tax of petitioner and the group for 1984.  Instead, for 1984, petitioner and the group are entitled to recover an overpayment of the income tax of the group in the amount of $1,018,849.

## Discussion

The issue we must decide is whether the tentative refunds paid to Acme with respect to 1981 and 1984 constitute rebates to petitioner and the group for purposes of computing the group's deficiencies for 1981 and 1984, if any, pursuant to section 6211. Section 6211(a) defines the term "deficiency" as the amount by which the tax actually imposed exceeds--

(1)  the sum of

(A)  the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus

(B)  the amounts previously assessed (or collected without assessment) as a deficiency, over--

(2)  the amount of rebate**s**, as defined in section 6211(b)(2), made.[6] [Emphasis added.]

---

6    Reduced to mathematical terms, the statutory definition of the term "deficiency" may be stated as follows:

Deficiency = correct tax - (tax on return + prior assessments - rebates)
          = correct tax -  tax on return - prior assessments + rebates

(continued...)

Section 6211(b)(2) defines a "rebate" as an abatement, credit, refund, or other repayment made on the ground that the tax imposed was less than the amount shown on the return and the amounts previously assessed or collected without assessment. See also Groetzinger v. Commissioner, 69 T.C. 309, 314 (1977). Accordingly, not all refunds are rebates. See O'Bryant v. United States, 49 F.3d 340 (7th Cir. 1995); Groetzinger v. Commissioner, supra at 312. Generally, a rebate refund is issued on the basis of a substantive recalculation of the tax owed. See O'Bryant v. United States, supra at 342. A nonrebate refund, however, is issued, not because of a determination by the Commissioner that the tax paid is not owing, but for some other reason, such as a mistake made by the Commissioner. Id. The rebate versus nonrebate distinction arises from the definition of the term "deficiency" contained in section 6211; rebate refunds can be included in deficiency computations, while nonrebate refunds cannot. Id.

Petitioner contends that, because the tentative refunds were delivered to the wrong taxpayer, those tentative refund allowances constitute, for purposes of determining whether the group has deficiencies for 1981 and 1984, nonrebate refunds with respect to petitioner and the group. Petitioner contends that

---

[6](...continued)
See Midland Mortgage Co. v. Commissioner, 73 T.C. 902, 907 (1980); Kurtzon v. Commissioner, 17 T.C. 1542, 1548 (1952).

section 1.1502-78(b)(1), Income Tax Regs., required delivery of the tentative refunds to petitioner, as the successor common parent for the group.  Accordingly, petitioner argues, the tentative refunds are not rebate refunds with respect to petitioner and the group and cannot be included in the computation of the group's deficiencies for the years in issue.

Respondent concedes that a refund issued to the wrong taxpayer, or to an unauthorized representative of the taxpayer, is a nonrebate refund which may not be taken into account in computing the taxpayer's deficiency.  Respondent, however, argues that the tentative refunds were not issued to the wrong taxpayer. Respondent contends that payment to Acme was proper because, pursuant to section 1.1502-78(b)(1), Income Tax Regs., and Union Oil Co. v. Commissioner, 101 T.C. 130 (1993), both Acme and petitioner were authorized recipients of the tentative refunds. Accordingly, respondent argues, because the tentative refunds were paid to an authorized recipient, such refunds constitute rebate refunds with respect to the group for purposes of computing its deficiencies for 1981 and 1984.

Section 6411(a) authorizes a corporation that has sustained a net operating loss (NOL) to apply for a tentative carryback adjustment of the tax for the prior taxable year to which the NOL is carried.  The application of section 6411, however, is subject to such conditions, limitations, and exceptions as prescribed by regulation when the applicant made or was required to make a consolidated return either for the year in which the NOL arose,

or for the prior taxable year to which the NOL is carried.  See

sec. 6411(c).  Section 1.6411-4, Income Tax Regs.,

cross-references section 1.1502-78, Income Tax Regs., for rules

applicable to consolidated groups.

Section 1.1502-78, Income Tax Regs., provides, in part, as

follows:

> (a)  General Rule.--If a group has a consolidated
> net operating loss, a consolidated net capital loss, or
> a consolidated unused investment credit for any taxable
> year, then any application under section 6411 for a
> tentative carryback adjustment of the taxes for a
> consolidated return year or years preceding such year
> shall be made by the common parent corporation to the
> extent such loss or unused investment credit is not
> apportioned to a corporation for a separate return year
> pursuant to §1.1502-79(a), (b), or (c).  In the case of
> the portion of a consolidated net operating loss or
> consolidated net capital loss or consolidated unused
> investment credit to which the preceding sentence does
> not apply, and in the case of a net capital or net
> operating loss or unused investment credit arising in a
> separate return year which may be carried back to a
> consolidated return year, the corporation or
> corporations to which any such loss or credit is
> attributable shall make any application under section
> 6411.

> (b)  Special Rules.--(1) Payment of refund.  Any
> refund allowable under an application referred to in
> paragraph (a) of this section shall be made directly to
> and in the name of the corporation filing the
> application, except that in all cases where a loss is
> deducted from the consolidated taxable income or a
> credit is allowed in computing the consolidated tax
> liability for a consolidated return year, any refund
> shall be made directly to and in the name of the common
> parent corporation.  The payment of any such refund
> shall discharge any liability of the Government with
> respect to such refund. [Emphasis added.]

The dispute in the instant case centers around the

application of section 1.1502-78(b)(1), Income Tax Regs., with

respect to payment of the tentative refunds.[7]  The second clause of section 1.1502-78(b)(1), Income Tax Regs., as emphasized above, is applicable to the facts of the instant case because the NOL in issue was carried back and deducted from the group's consolidated taxable income for the consolidated return years 1981 and 1984.  Petitioner contends that, pursuant to section 1.1502-78(b)(1), Income Tax Regs., the service center was required to direct payment of the tentative refunds to petitioner, the successor common parent of the group.  Respondent argues that the term "common parent corporation" in section 1.1502-78(b)(1), Income Tax Regs., refers to either the common parent of the group for the consolidated taxable year for which the tentative refund is made (i.e., Acme), at least where such common parent remains in existence, or the group's successor common parent (i.e., petitioner).

If the common parent is the same in the loss year and in the carryback year, there is no question to which corporation section 1.1502-78(b)(1), Income Tax Regs., directs payment.  Where, however, the common parent for the group in the loss year is different from the common parent for the group in the carryback year, as in the instant case, the regulations are unclear as to where payment of the tentative refund must, or may, be directed. Section 1.1502-78(b)(1), Income Tax Regs., does not indicate

---

[7]     The parties agree that Acme properly relied on sec. 1.1502-78(a), Income Tax Regs., in filing its applications for tentative refund allowance of the tax paid by the group for the taxable years 1981 and 1984.

whether the authorized recipient common parent corporation is the common parent for the year in which the NOL arose or for the prior consolidated taxable year to which the NOL is carried.[8]

Accordingly, we must decide which common parent (petitioner or Acme) is authorized under section 1.1502-78(b)(1), Income Tax Regs., to receive the tentative refunds. Absent clear direction from section 1.1502-78, Income Tax Regs., we look elsewhere in the consolidated return regulations for guidance to identify the entity that is the authorized recipient of the tentative refunds.

A central feature of the consolidated return regulations is the role of the common parent as the exclusive agent for the consolidated group with respect to all procedural matters. See Southern Pac. Co. v. Commissioner, 84 T.C. 395, 401 (1985); sec. 1.1502-77(a), Income Tax Regs. In delineating the scope of the common parent's agency, the regulations specifically provide that the common parent shall act as agent for all the affiliates for such purposes as receiving deficiency notices, executing waivers, filing refund claims, and receiving refunds. Southern Pac. Co. v. Commissioner, supra; sec. 1.1502-77(a), Income Tax Regs.

---

[8]    Additionally, we note that the examples set forth in sec. 1.1502-78(c), Income Tax Regs., provide no instruction as to where payment should be directed when the common parent in the loss year is different than the common parent in the carryback year. The common parent in sec. 1.1502-78(c) Examples (1) to (3), Income Tax Regs., is the same in both the loss year and in the carryback year. Consequently, there is no question in the examples as to where payment should be directed. Sec. 1.1502-78(c) Example (4), Income Tax Regs., is inapposite because it involves a consolidated net operating loss carryback to a separate return year rather than to a consolidated return year.

Section 1.1502-77(a), Income Tax Regs., provides, in part, as follows:

> The common parent, for all purposes (other than the making of the consent required by paragraph (a)(1) of §1.1502-75, the making of an election under section 936(e), the making of an election to be treated as a DISC under §1.992-2, and a change of the annual accounting period pursuant to paragraph (b)(3)(ii) of §1.991-1) shall be the sole agent for each subsidiary of the group, duly authorized to act in its own name in all matters relating to the tax liability for the consolidated return year.

By its terms, the above-quoted regulation contemplates that the common parent's authority to act as agent for the consolidated group arises on a year-by-year basis with respect to the group's consolidated income tax liability. Southern Pac. Co. v. Commissioner, supra at 401. Accordingly, for any given year in which a consolidated return is filed, the entity that is the common parent for that particular year continues as the sole agent with respect to any procedural matters that may arise in connection with the group's tax liability for that year. Id. Of course, if the common parent ceases to exist, its authority to act for the group terminates. Id. In Southern Pac. Co., we held that if the old common parent in a reverse acquisition, as specified in section 1.1502-75(d)(3)(i), Income Tax Regs., does not continue to exist after the reorganization, the new common parent succeeds the old common parent as the agent of the group for purposes of the issuance of notices of deficiency for years both before and after the reorganization. Southern Pac. Co. v. Commissioner, supra at 404.

Respondent contends that under the authority of <u>Union Oil Co. v. Commissioner</u>, 101 T.C. 130 (1993), Acme is an authorized recipient of the tentative refunds. In <u>Union Oil Co.</u>, we held that, if the old common parent in a reverse acquisition, as specified in section 1.1502-75(d)(3)(i), Income Tax Regs., continues to exist after the reorganization, both the old common parent and the new common parent are agents for the affiliated group for purposes of the issuance of notices of deficiency for years before the reverse acquisition. <u>Union Oil Co. v. Commissioner</u>, <u>supra</u> at 140. <u>Union Oil Co.</u> is distinguishable from the instant case because the old common parent remained affiliated with the group after the reorganization. We did not have occasion in <u>Union Oil Co.</u> to consider whether a former common parent that is no longer affiliated with the group is an authorized representative of the group for purposes of receiving tentative refunds relating to years during which it controlled the group where the group has a new common parent. Accordingly, <u>Union Oil Co.</u> is not dispositive of the issue involved in the instant case.

After considering <u>Southern Pac. Co. v. Commissioner</u>, <u>supra</u>, and <u>Union Oil Co. v. Commissioner</u>, <u>supra</u>, and considering the arguments of the parties and the facts of the instant case, we conclude that Acme's authority to act for the group, at least with respect to the issuance and receipt of tentative refunds, terminated when its affiliation with the group terminated. With respect to the group, it is as though Acme ceased to exist. Cf.

<u>Southern Pac. Co. v. Commissioner</u>, <u>supra</u>.  Accordingly, Acme was not an authorized recipient of the tentative refunds.  We believe that the result we reach today is consistent with, and a logical extension of, the rationale underlying our earlier decisions in <u>Southern Pac. Co. v. Commissioner</u>, <u>supra</u>, and <u>Union Oil Co. v. Commissioner</u>, <u>supra</u>.

Consequently, we hold that the tentative refunds are nonrebate refunds with respect to petitioner and the group for purposes of computing the group's deficiencies for 1981 and 1984. Therefore, respondent cannot seek recovery of the tentative refunds from petitioner through the deficiency procedures.

We have considered the parties' remaining arguments and find them to be either without merit or unnecessary to reach.

To reflect the foregoing,

<u>An appropriate order</u>

<u>will be issued.</u>